John DESCHAMPE, Respondent,

v.

ARROWHEAD TREE SERVICE and
Fireman's Fund Insurance
Company, Relators.

No. C6–88–232.

Supreme Court of Minnesota.

Aug. 26, 1988.

Deborah L. Crowley, Golden Valley, for relators.

James Courtney, III, Duluth, for respondent.

COYNE, Justice.

This review of a decision of the Workers' Compensation Court of Appeals raises issues concerning the manner of payment of impairment compensation and the application of the new permanent partial disability schedules contained in chapter 5223 of the Minnesota Rules.

On May 29, 1984, John Deschampe fell from a tree while working for Arrowhead Tree Service. As a result of the fall, employee received a closed head brain injury as well as arm and leg injuries. The employee was comatose for a period of time and was hospitalized until October 1984, with the last two and a half months of the hospitalization spent in a rehabilitation unit.

The employer's compensation insurer, Fireman's Fund Insurance Company, began making workers' compensation payments shortly after the accident. A claim petition was served in January 1985. The answer admitted that the employee was permanently totally disabled but denied that he was permanently partially disabled to the extent claimed. A settlement reached in May 1985 stipulated that payment for nursing services provided by employee's mother, an LPN, would be paid by the insurer, as would a minimum of 22 weeks of impairment compensation. The remaining issues, including the extent of employee's permanent partial disability, were then scheduled for a hearing before a compensation judge.

The compensation judge found that employee had sustained 88.17 percent permanent partial disability of the body as a whole, which was to be paid as impairment compensation on a weekly basis pursuant to Minn.Stat. § 176.101, subd. 3o (1984), rather than in a lump sum. The WCCA, in affirming some of the compensation judge's findings regarding the percentage of whole body disability for certain impairments and modifying others, concluded that the employee sustained 97.97 percent permanent partial disability of the body as a whole. In addition, the WCCA affirmed by evenly divided vote the compensation judge's ruling that impairment compensation should not be paid in a lump sum. We affirm the ruling as to the manner of payment but reverse in part the WCCA's determinations concerning permanent partial disability.

I.

The parties raise several issues regarding the interpretation and application of the new permanent partial disability schedules contained in chapter 5223 of the Minnesota Rules.

## A.

■ The first issue concerning the schedules is whether the assignment of a permanent partial disability rating under two or more sections of the brain injury subpart of the central nervous system schedule constitutes an impermissible cumulation of lesser included categories.

The permanent partial disability schedule for the central nervous system is divided into several subparts, each addressing a separate component or function of the central nervous system. *See* Minn. Rules § 5223.0060 (Supp.1986). The brain injury subpart, subpart 8, itself contains 12 sections designated A through L, representing different impairments that may result from a brain injury. Minn.Rules § 5223.0060, subp. 8. Each section, in turn, contains a series of diagnostic descriptions and a corresponding percentage of disability of the whole body.

In determining the employee's permanent partial disability in the instant case the compensation judge assigned ratings under four of the sections in subpart 8 of the central nervous system schedule: C. complex integrated cerebral function disturbances (50 percent); D. emotional disturbances and personality changes (65 percent); G. motor dysfunction (15 percent); and I. epilepsy (10 percent). The WCCA modified the ratings for the first and third of these four sections upward and also assigned disability ratings for two additional sections: A. communications disturbances, expressive (10 percent); and F. consciousness disturbances (40 percent).

The employer asserts that the assignment of multiple disability ratings under the brain injury subpart constitutes an impermissible cumulation of lesser included categories. That contention is grounded on Minn.Stat. § 176.105, subd. 4(c) (1984) and the corresponding provision in the interpretation portion of the schedules. Section 176.105 states, in part:

(c) If an employee suffers a permanent functional disability of *more than one body part* due to a personal injury incurred in a single occurrence, the percent of the whole body which is permanently

partially disabled shall be determined by the following formula so as to ensure that the percentage for all functional disability combined does not exceed the total for the whole body:

$$A + B (1-A)$$

where: A is the greater percentage whole body loss of the *first body part;* and B is the lesser percentage whole body loss otherwise payable for the *second body part.*

Minn.Stat. § 176.105, subd. 4(c) (1984) (emphasis added). The corresponding provision in the permanent partial disability schedules states: "where an impairment must be rated under *more than one category,* the ratings must be combined using the A + B (1–A) formula" of section 176.-105, subd. 4(c). Minn.Rules § 5223.0010, subp. 2 (emphasis added). The rules also state that the disability determination "shall not be based on the cumulation of lesser included categories." *Id.*

Based on the language of the statute and the rule, the employer makes this argument: "Body part" is the equivalent of "category" and "lesser categories" are conditions affecting the particular body part or category. Ratings may not be assigned to one body part or category under more than one section and cumulated under the statutory formula. The brain is the only applicable body part or category involved here, the employer contends; the sections describing various impairments are merely lesser categories. Thus, the employer concludes, to assign ratings under more than one section of the brain category is to impermissibly cumulate lesser included categories.

Both the compensation judge and the WCCA rejected the employer's argument. While we agree that the employer's position rests on a misinterpretation of the statute and the disability schedules, we can accept neither the declaration of WCCA majority that as a scientific medical fact each segment of the brain constitutes a separate body part nor its determination that employee's several impairments are the result of trauma to separate segments

of the brain. The permanent partial disability schedules themselves, Minn.Rules 5223.0010 through 5223.0250, refer only to the brain as an organ. There is no reference to separate parts of the brain. It is, of course, generally recognized that different parts of the brain are specialized to perform different functions. But although it may not be inaccurate to identify a particular segment of the brain as the area primarily associated with a function such as vision, to say, as does the WCCA majority, that each function is controlled by a separate and distinct part of the brain and, hence, by a separate body part strikes us as impermissible over-simplification in disregard of the vast network of interconnections within the brain. The physiology of the human body and the relationship between trauma and disability are subjects about which the law has traditionally looked to expert medical opinion testimony. The testimony of the several medical experts who participated in the evaluation of employee's condition established the causal relationship between his brain injury and his impairments only in a general way. There was no attempt to link individual functional impairments with trauma to a specific segment of the brain. To supplement the record by judicial notice of the particularity of function within an organ as complex as the brain seems to us presumptuous.

That the brain must itself be regarded as a single body part does not, however, validate the employer's position, for the employer's argument ignores the definition of "category" at Rule 5223.0020, subp. 9:

'Category' means a permanent partial disability as described in this chapter and the corresponding percent of disability to the whole body for that permanent partial disability.

Moreover, the employer's argument gives inadequate consideration to the basis for payment of compensation for permanent partial disability: economic recovery compensation or impairment compensation is payable for permanent functional loss of use or impairment of function. Minn.Stat. § 176.021, subd. 3 (1984). *See also Moes v. City of St. Paul,* 402 N.W.2d 520, 525–26

(Minn.1987). Section 176.105 focuses not on the body part which sustained direct injury but rather on the resultant permanent functional disability. An example illustrates how limiting the application of the disability schedules according to the number of injured body parts frustrates the goal of compensating multiple functional impairments in terms of disability of the whole body. Subpart 6 of the central nervous system schedule involves dysfunction of the hypoglossal nerve and contains two sections: A. swallowing impairment, and B. mechanical disturbances of articulation. Minn.Rules § 5223.0060, subp. 6. Assume two employees suffer work-related injuries to their hypoglossal nerve. The injury to the first employee causes a swallowing impairment requiring her diet to be restricted to liquids (6(A)(2), 25 percent) and also disturbs her speech so that it is not easily understood by nonfamily members (6(B)(2), 10 percent). The second employee suffers only a swallowing impairment requiring his diet to be restricted to liquids (6(A)(2), 25 percent). It is apparent that although each employee has sustained direct injury to only one body part, the first employee has suffered two distinct functional impairments with greater resultant disability to the body as a whole than has the second employee.

The directive for interpretation of the disability schedules contained at Minn. Rules § 5223.0010, subp. 2, recognizes that more than one category may be necessary to represent the disabling condition, and the rule directs that categories are to be selected to avoid double compensation for any part of a condition and that the ratings should be combined using the formula A + B (1–A) contained in section 176.105, subd. 4(c). That formula is designed to ensure that when an injury causes two or more functional impairments "the percentage for all *functional disability* combined does not exceed the total for the whole body." Minn.Stat. § 176.105, subd. 4(c) (emphasis added). The formula is based upon the principle that each impairment acts not on the whole person, but on the unimpaired portion that remains after other impair-

ments have been taken into account. AMA *Guides to the Evaluation of Permanent Impairment* viii (2d ed. 1984). The use of the formula in conjunction with the schedules permits the value of each impairment to be determined separately according to the categories established in the schedules and then combined in relationship to the whole body. *See Zweber v. Rosemount, Inc.*, 419 N.W.2d 70 (Minn.1988).

Accordingly, we hold that where the assignment of permanent partial disability ratings under two or more sections of the brain injury subpart of the central nervous system schedule is necessary to represent the employee's disablement, the ratings for the two or more categories of impairment may be combined using the statutory formula.[1] Of course, levels of severity under one category of impairment may not be cumulated. The record before us in this case supports the determination that it is necessary to assign ratings under more than one section of the brain injury schedule in order to properly represent the employee's disabling condition.

▪█ Our conclusion that where brain dysfunction causes functional losses of use or impairment of different kinds, rating under more than one category may be necessary to the proper evaluation of disability does not, however, mean that multiple ratings are always appropriate. The rule specifically directs selection of the category most closely resembling the condition if more than one category may be applicable. Minn.Rules 5223.0010, subp. 2 (1984). When resort to more than one category is necessary to the proper rating of an employee's impairments, the categories must be identified and selected with care in order to avoid exaggeration of the disability in its entirety. Brain injuries possess a particular potential for exaggeration of the percentage of permanent partial disability of the body as a whole. The AMA Guides recognize that evaluation of central nerv-

ous system impairment is difficult "because of the complex relationships between the brain and the mind. It is impossible to avoid consideration of associated mental, emotional and personality processes." AMA *Guides to the Evaluation of Permanent Impairment* 61 (2d ed. 1984). The absence of clear lines of demarcation presents the possibility of duplication or overlap. Moreover, the categories for evaluating impairments resulting from injury to the brain are established in terms of restrictions or limitations of the employee's ability to perform the activities of daily living rather than in terms of specific diagnoses. *See* Minn.Rules 5223.0060, subp. 8 and 8(B) communication disturbances, receptive, 8(C) complex integrated cerebral function disturbances, 8(D) emotional disturbances and personality changes, 8(E) psychotic disorders, and 8(F) consciousness disturbances. The inability to live independently or the need of supervision or direction in some activities may be the result of one particular category of impairment or it may be the product of the combination of several types of impairment. In either case if the fact that the injured employee is unable to live independently or requires supervision or direction is used to increase the severity level rating of more than one impairment, the result is likely to violate the rule against double compensation. Minn.Rule 5223.0010, subp. 2 (1984) ("Where more than one category is necessary to represent the disabling condition, categories shall be selected to avoid double compensation for any part of a condition.")

### B.

The employer also contends that even if the condition resulting from the employee's brain injury may properly be rated under more than one category, the ratings adopted here are not justified by the evidence.

---

**1.** We recognize that the AMA *Guides to the Evaluation of Permanent Impairment* limits disability ratings for permanent impairment resulting from dysfunction of the brain to one category of impairment even though the brain injury may result in more than one category of impairment.

AMA *Guides to the Evaluation of Permanent Impairment* 61–66 (2d ed. 1984). The disability schedule for the central nervous system, however, neither references the AMA Guides, *see* Minn.Rule 5223.0010, subp. 4 (1984), nor includes any limiting language.

The following table illustrates the ratings made by the compensation judge under subpart 8 of the central nervous system schedule and the WCCA's affirmance or modification of each rating:

| Category | Rating Comp Judge | WCCA |
|---|---|---|
| 1. 8(C) complex integrated cerebral function disturbances | 50% | 70% |
| 2. 8(F) consciousness disturbances | -0- | 40% |
| 3. 8(A) communications disturbances, expressive | -0- | 10% |
| 4. 8(G) motor dysfunction | 15% | 30% |
| 5. 8(D) emotional disturbances and personality changes | 65% | 65% |
| 6. 8(I) epilepsy | 10% | 10% |
| 7. 8(B) communications disturbances, receptive | -0- | -0- |

■ Of the ratings on which the compensation judge and WCCA concur, the employer attacks only the rating for emotional disturbances and personality changes [8(D)]. Where, as here, the WCCA affirms a finding of fact, this court will affirm unless, viewing the evidence in the light most favorable to the findings, we conclude that the finding is manifestly contrary to the evidence. *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 60–61 (Minn. 1984). Under this standard the 65 percent rating for emotional disturbances and personality changes must be affirmed.

Dr. Lawrence Farber, a neurologist, and Dr. Philip Haber, a clinical psychologist who performed psychometric testing required under 8(D), concurred in the opinion that the employee suffered emotional disturbance as a result of his injury and that the diagnostic description corresponding to a 65 percent rating fitted employee's condition. Although Dr. Matthew Eckman, employee's treating physician, regarded employee's depression as "most likely situational," a neurological consultant who participated with Dr. Eckman in an evaluation of employee's condition considered some "residual mood changes" a very likely result of the injury. On this record it cannot be said that the 65 percent rating for emotional disturbance and personality change is manifestly contrary to the evidence.

■ We agree, however, with the employer's contention that the WCCA exceeded its authority when it substituted its 70 percent rating for the compensation judge's 50 percent rating for complex integrated cerebral function disturbances [8(C)] and interposed a 40 percent rating for consciousness disturbances [8(F)]. The WCCA may not substitute its view of the evidence for that adopted by the compensation judge if the compensation judge's findings are supported by evidence that a reasonable mind might accept as adequate. *See Jacobowitch v. Bell & Howell*, 404 N.W.2d 270, 274 (Minn.1987).

The compensation judge adopted Dr. Matthew Eckman's rating of 50 percent for complex, integrated cerebral function disturbances based on his observations as employee's treating physician and on reports by and consultations with other health care professionals, including a clinical psychologist, occupational therapist, neurologist, and speech pathologist. Included in Dr. Eckman's report, which was prepared one month before the compensation hearing, are these comments under the heading "cognitive dysfunction": "employee appeared to demonstrate adequate judgment and control during his week of observation" and "was not impulsive or noticeably unsafe in his daily living tasks." The report shows a full scale IQ of 80 and that the employee reads at the fifth grade level and functions at the eighth grade level in mathematics. The report indicates that the employee can make coffee by following written directions for the use of a coffeemaker with which he was unfamiliar. The report recommends that the employee be given more responsibility for household tasks such as cooking and laundry.

The WCCA, however, rejected Dr. Eckman's evaluation out of hand and adopted Dr. Farber's rating of 70 percent on the ground that "the evidence of record is uncontroverted that the employee is not capable of living alone." In fact, Dr. Eckman recognized that the employee needed supervision by a responsible adult on a regular basis, but his comments concerning the employee's dependence with respect to daily living activities appear to be based on the totality of functional impairments caused by the injury. Employee's inability to live

alone was recognized in the rating assigned for emotional disturbances. Given the employee's level of cognitive functioning, if only impairment of "memory, judgment, or other higher level cognitive abilities" are considered in assessing employee's need for supervision, a reasonable mind could accept as adequate the evidence supporting the conclusion that employee has a moderate level of impairment of higher level cognitive abilities as a result of injury and, were that his only impairment, he could live alone with some supervision. Minn.Rules § 5223.0060, subp. 8(C)(3) (1984).

■ The fallacy in the WCCA's analysis is repeated in its 40 percent rating for consciousness disturbances. The diagnostic description for this rating is "mild or intermittent decreased level of consciousness manifested by periodic mild confusion or lethargy, a score of 16 to 28 on the Kenny scale." Minn.Rules § 5223.0060, subp. 8(F)(1) (1984). Dr. Farber, in consultation with Dr. Haber, assigned a 40 percent rating under this category, based primarily on employee's 24.6 score on the Kenny Self–Care Evaluation in July 1985. Dr. Farber also based his rating on what he described as "periods where he [the employee] would get out of it and confused," although this description appears to come from employee's mother rather than Dr. Farber's personal observation.

Dr. Eckman, on the other hand, did not assign any rating for consciousness disturbances. Employee's 27.7 Kenny score in May 1986 appears linked to his motor dysfunction rather than any "periodic mild confusion or lethargy," and the score on the Kenny scale is part of the diagnostic description on which the rating for employee's motor dysfunction rests. Dr. Eckman noted some lethargy and problems with attention span, but he thought them caused by employee's sedentary lifestyle, and he recommended increased stimulation through participation in a sheltered workshop.

Considered as a whole and in conjunction with the other ratings, the record contained substantial evidence to support the compensation judge's finding that no permanency

rating was appropriate for consciousness disturbances. The WCCA improperly substituted its own rating for this category.

On the other hand, the WCCA correctly set aside the compensation judge's findings and interposed ratings in three categories: communications disturbances, expressive; motor dysfunction, upper extremities; and loss of vision.

■ The witnesses uniformly recognized that employee's speech was slurred and mildly dysarthric although it was quite understandable. The diagnostic description of an expressive communication disturbance given a 10 percent rating is a mild speech disturbance "not significantly impairing the ability to be understood, such as * * * mild dysarthria." Minn.Rules § 5223.0060, subp. 8(A)(1) (1984). Accordingly, the record does not substantially support the failure to award a 10 percent rating for this category of functional impairment, and we affirm the WCCA's substituted rating of 10 percent for communications disturbances, expressive.

■ There also seems to be no question that the employee was entitled to a 15 percent rating for motor dysfunction of the upper extremities as well as the 15 percent rating the compensation judge awarded for motor dysfunction of the lower extremities. All of the health care professionals who examined the employee noted his impaired digital dexterity. Employee's score of 27.7 on the Kenny scale is within the range of diagnostic description of the 15 percent rating. Moreover, it appears from the compensation judge's discussion of employee's various impairments in the memorandum attached to his findings that the omission of a rating for the upper extremities was the result of oversight rather than a zero rating. Accordingly, we affirm the WCCA's rating of 15 percent for motor dysfunction of the upper extremities. We observe, however, that motor dysfunction impairments are to be rated as provided in subpart 7 of the schedule, which sets out separate ratings for upper and lower extremities for combination pursuant to the statutory formula. Therefore, the 15 percent rating for the upper extremities and

the 15 percent rating for the lower extremities should not have been added together to produce a single motor dysfunction rating but should have been listed separately and combined using the formula A + B (1–A). With that modification we affirm the WCCA award for motor dysfunction.

■ Dr. Marshall Petersen, optometrist, tested employee's visual efficiency and concluded that a 36 percent disability of the whole body was appropriate under the eye schedule. *See* Minn.Rules § 5223.0030, subp. 6 (1984). The compensation judge declined to assign a disability rating for vision loss on the ground that no rating was permissible under the eye schedule because the vision loss was attributable to the brain injury, not to employee's eyes. While the compensation judge apparently was correct in relating employee's visual deficiency to the injury to his brain rather than an injury to his eyes, that employee has sustained some functional loss of vision is uncontroverted. Since there is no reference in subpart 8 of Rule § 5223.0060, the brain injury portion of the central nervous system schedule, or, in fact, in any part of section 5223.0060 to a rating based on vision loss or impairment, it seems to us that the WCCA's 36 percent disability rating for vision impairment represents a correct interpretation of the disability schedules.

■ Finally, based on our examination of the record, we cannot say that the ratings assigned with respect to employee's epilepsy [subp. 8(I) ] or that the rejection of employee's proposed separate ratings for communications disturbances, reception [subp. 8(B) ], limitation of ankle motion [Rule 5223.0170, subp. 7(A)(4) ], or rigidity of back [Rule 5223.0070, subp. 2(A)(3) ] are manifestly contrary to the evidence. The ratings of 6 percent for limitation of elbow motion [Rule 5223.0120, subp. 2(C)(1) ] and 6 percent for shortening of lower extremity [Rule 5223.0170, subp. 2(C) ] are not challenged.

In summary, we affirm in part and reverse in part the WCCA's ratings of the various categories of impairment sustained by employee. The separate ratings, as modified by this opinion, are these:

1. 5223.0060, subp. 8(D) emotional disturbances and personality changes — 65%
2. 5223.0060, subp. 8(C) complex integrated cerebral function disturbances — 50%
3. 5223.0030, subp. 6 loss of vision — 36%
4. 5223.0060, subp. 8(G) motor dysfunction upper extremities — 15% lower extremities — 15%
5. 5223.0060, subp. 8(A) communications disturbances, expressive — 10%
6. 5223.0060, subp. 8(I) epilepsy — 10%
7. 5223.0120, subp. 2(C)(1) limitation in motion of elbow — 6%
8. 5223.0170, subp. 2(C) shortening of lower extremity — 6%

Calculated pursuant to the statutory formula A + B (1–A), these combined ratings result in a rating of 94.21 percent disability of the body as a whole.

■ In conclusion, we observe that neither the concept of permanent partial disability nor the statutory formula for combining multiple impairments [A + B (1–A) ] will permit a rating of 100 percent permanent partial disability of the body as a whole. Minn.Stat. § 176.105, subd. 4(c) (1984). The disability rating for an individual in a persistent vegetative state is 99 percent. Thus, fairness dictates that each employee's condition as a whole must be kept in perspective so that the aggregate award falls within a relatively appropriate range of impairment compensation.

## II.

■ The next issue is whether impairment compensation for an employee who is permanently totally disabled and does not return to work is to be paid on a periodic basis pursuant to Minn.Stat. § 176.101, subd. 3o (1984), rather than in a lump sum.

Section 176.101, subd. 3o(a), enacted in 1983, provides that an employee who is permanently totally disabled shall receive impairment compensation in addition to permanent total compensation. Subdivision 3o also provides that impairment compensation shall be paid "concurrently" with permanent total compensation "in the same intervals and amount" until the total

amount of impairment compensation due is paid. However, if the employee returns to work at any job during the time impairment compensation is being paid, then the remaining impairment compensation due shall be paid 30 days later. Minn.Stat. § 176.101, subd. 3o(a) (1984).[2]

Applying section 176.101, subd. 3o to the instant case, the compensation judge ordered the employer to continue making weekly impairment compensation payments until the total amount of impairment compensation due has been paid. The WCCA affirmed by an evenly divided vote. The employee argues that the compensation judge and WCCA erred in not ordering the payment of impairment compensation in a lump sum pursuant to section 176.021, subd. 3a. That subsection provides that payments for permanent partial disability shall be made by lump sum if temporary total disability benefits cease because the employee is receiving payments for permanent total disability. Minn.Stat. § 176.021, subd. 3a (1984).[3]

The parties agree that subdivision 3o of section 176.101 and subdivision 3a of section 176.021 are irreconcilable: 3o requires in straightforward language that impairment compensation be paid on a periodic basis to employees who are permanently totally disabled while 3a requires that such compensation be paid in a lump sum. Both the compensation judge and the WCCA attempted to reconcile the irreconcilable by basing the manner of payment of impairment compensation on the timing of employee's permanent total disability. The compensation judge found that employee had been permanently totally disabled from the date of injury and ordered impairment compensation paid periodically. The order for periodic payment was affirmed by the even division of the WCCA. The members who would have ordered impairment compensation paid in a lump sum found that employee was temporarily totally disabled for the three months during which he was comatose. We are not persuaded that the manner of payment of impairment compensation turns on such an artificial and arbitrary matter as the moment at which it can be said that the employee is permanently totally disabled. The issue is, rather, one of statutory construction: which of two contradictory provisions should prevail. The legislative history of these two provisions, when combined with the rule of statutory construction that the law latest in date of final enactment shall prevail, leads us to conclude that section 176.101, subd. 3o controls.

2. The full text of subdivision 3o(a) provides as follows:

Subd. 3o. **Inability to return to work.** (a) An employee who is permanently totally disabled pursuant to subdivision 5 shall receive impairment compensation as determined pursuant to subdivision 3b. This compensation is payable in addition to permanent total compensation pursuant to subdivision 4 and is payable concurrently. In this case the impairment compensation shall be paid in the same intervals and amount as the permanent total compensation was initially paid, and the impairment compensation shall cease when the amount due under subdivision 3b is reached. If this employee returns to work at any job during the period the impairment compensation is being paid, the remaining impairment compensation due shall be paid in a lump sum 30 days after the employee has returned to work and no further temporary total compensation shall be paid.

Minn.Stat. § 176.101, subd. 3o(a) (1984).

3. Subdivision 3a provides as follows:

Subd. 3a. **Permanent partial benefits, payment.** Payments for permanent partial disability as provided in section 176.101, subdivision 3, shall be made in the following manner:

(a) If the employee returns to work, payment shall be made by lump sum;

(b) If temporary total payments have ceased, but the employee has not returned to work, payment shall be made at the same intervals as temporary total payments were made;

(c) *If temporary total disability payments cease because the employee is receiving payments for permanent total disability* or because the employee is retiring or has retired from the work force, *then payment shall be made by lump sum;*

(d) If the employee completes a rehabilitation plan pursuant to section 176.102, but the employer does not furnish the employee with work he can do in his permanently partially disabled condition, and the employee is unable to procure such work with another employer, then payment shall be made by lump sum.

Minn.Stat. § 176.021, subd. 3a (1984) (emphasis added).

Prior to 1981, the manner in which permanent partial disability benefits were paid was governed by subdivision 3 of section 176.021. Under that system the injured employee was paid 25 percent of permanent partial disability benefits 4, 8, 12, and 16 weeks after the injury, unless he returned to work earlier; in that case he received the unpaid balance as a lump sum. Minn.Stat. § 176.021, subd. 3 (1980).

In 1981 the four-part payment system was deleted from subdivision 3 of section 176.021 and subdivision 3a, on which the employee relies here, was added. *See* Act of June 1, 1981, ch. 346, §§ 57–58, 1981 Minn.Laws 1611, 1644–46. After the 1981 amendments, subdivision 3 of 176.021 continued to govern the commencement of compensation; but the coordination of permanent partial disability benefits with other types of workers' compensation benefits and the manner—periodically or lump sum—in which permanent partial disability benefits were paid were governed by the new provision, subdivision 3a. *Quam v. State,* 391 N.W.2d 803, 806 n. 1 (Minn.1986) (under 1982 law manner of payment governed by section 176.021, subd. 3a). These two provisions operated in this way: subdivision 3 stated that compensation for permanent partial disability was payable concurrently with compensation for permanent total disability "as provided in subdivision 3a." Minn.Stat. § 176.021, subd. 3 (1982). Subdivision 3a of section 176.021 provided for payment of permanent partial disability benefits in a lump sum if temporary total disability payments ceased because the employee was receiving permanent total disability benefits. Minn.Stat. § 176.021, subd. 3a (1982).

This interaction between subdivisions 3 and 3a of section 176.021 was changed by the 1983 amendments. References in subdivision 3 to subdivision 3a concerning the manner of payment of permanent partial disability benefits were replaced by references to section 176.101, which established a new payment system. Act of June 7, 1983, ch. 290, § 33, 1983 Minn.Laws 1310, 1329–30, *codified at* Minn.Stat. § 176.021, subd. 3 (1984). *Cf.* Minn.Stat. § 176.021, subd. 3a (1984) *and* Act of June 7, 1983, ch.

290, §§ 44–63, 1983 Minn.Laws 1310, 1339–47, *codified at* Minn.Stat. § 176.101, subdivisions 3a–3x (1984). Thus, with the 1983 amendments, subdivision 3 of section 176.021 provided that the manner of payment of impairment compensation (formerly permanent partial disability) was to be governed by section 176.101 rather than subdivision 3a of section 176.021, as previously.

The 1983 legislature, by setting up the interplay between subdivision 3 of section 176.021 and section 176.101, subds. 3a–3t, and by deleting the links between subdivisions 3 and 3a of section 176.021, apparently overlooked the fact that subdivision 3a of section 176.021 serves no function with respect to injuries which occur after January 1, 1984. This conclusion is based upon the conflict created by the enactment of the manner of payment provisions of 176.101 without the repeal of 176.021, subd. 3a, as well as by two other factors. First, the "impairment compensation" and "economic recovery compensation" terminology of the two-tier system enacted in 1983 was not incorporated into subdivision 3a, which still retains the "permanent partial disability benefits" language. Second, subdivision 3a continued to refer to payments for permanent partial disability "as provided in section 176.101, subdivision 3," even though that provision was repealed by the 1983 amendments. *See* Act of June 7, 1983, ch. 290, § 173, 1983 Minn.Laws 1310, 1404–05.

Thus, it appears that the failure to repeal subdivision 3a of section 176.021, the provision on which the lump sum argument rests, may have been inadvertent. In any case, since that provision and section 176.101, subd. 3o are irreconcilable, the provision latest in date of enactment—section 176.101, subd. 3o—governs. *See* Minn. Stat. § 645.26, subd. 4 (1986). Accordingly, we affirm the award of impairment compensation payable weekly pursuant to Minn.Stat. § 176.101, subd. 3o (1984), rather than in a lump sum.

AFFIRMED IN PART; REVERSED IN PART.