# STATE OF MICHIGAN

# COURT OF APPEALS

SHELBY BAUMGARTNER, LORETTA COLE
and MARGARET SIBLE,

        Petitioners-Appellees,

v

PERRY PUBLIC SCHOOLS,

        Respondent-Appellant.

FOR PUBLICATION
March 12, 2015
9:00 a.m.

No. 313945
State Tenure Commission
LC No. 12-001101-ED

SARA AUBERT, PHILIP DAVID, PAULA
JUSTIN, KELLEE BEILFUSS, LISA BEILFUSS,
and KAREN KNAPP,

        Petitioners-Appellees,

v

REED CITY AREA SCHOOLS BOARD OF
EDUCATION,

        Respondent-Appellant.

No. 314158
State Tenure Commission
LC No. 12-000016

CARMEN ADAMO WRIGHT,

        Petitioner-Appellee,

v

BOARD OF EDUCATION OF THE FLINT
COMMUNITY SCHOOLS,

        Appellee.

No. 314696
State Tenure Commission
LC No. 12-000011

Before: DONOFRIO, P.J., and SAAD and METER, JJ.

-1-

SAAD, J.

In these consolidated appeals, respondent school districts ask us to reverse a series of orders entered by the State Tenure Commission, which instructed administrative law judges to hear petitioners' suits. For the reasons stated below, we hold that the State Tenure Commission does not have jurisdiction to hear petitioners' claims, and accordingly, we reverse its administrative orders and dismiss petitioners' actions.

## I. NATURE OF THE CASE

## A. THE LAW OF TEACHER LAYOFFS

This case is about governmental power and authority, and who gets to make and review decisions about teacher layoffs in the public schools. Prior to the historic enactment of the four pieces of tie-barred[1] legislation at issue,[2] teacher unions, for all practical purposes, decided what factors governed teacher layoffs. Though the Legislature could have decided, pursuant to its constitutional role in public education,[3] to make this important public-policy choice, it did not do so until 2011. Instead, by virtue of making teacher layoffs a mandatory subject of collective bargaining, the Legislature left the regulation of layoffs to the collective-bargaining process. Virtually all collective-bargaining agreements used seniority—described as "last in, first out" ("LIFO")—as the method for laying off teachers.[4]

Because length of service, not merit, governed who would be laid off and who would be retained, a simple application of LIFO meant that few disputes arose in the implementation of layoff decisions. But, if disputes occurred, the governmental agency that had (and has) exclusive authority over the enforcement of union-related public-sector labor laws,[5] the Michigan

---

[1] When the 2011 Amendments were bills, each 2011 Amendment was linked with the others so that none could become law unless the others became law.

[2] The 2011 Legislative Amendments are contained in 2011 Public Acts 100, 101, 102 and 103. Each amendment is discussed in greater detail later in the opinion. Throughout the opinion, we refer to these amendments collectively as "the 2011 Amendments."

[3] See Const 1963, Art 8 § 2 ("The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law").

[4] LIFO means that in the event of downsizing, "the most recently hired teachers are the first to be dismissed (regardless of their effectiveness), while the most veteran teachers are retained (also regardless of their effectiveness)." House Legislative Analysis, HB 4625, 4626, 4627, 4628, June 15, 2011. Because the LIFO rule made layoff decisions fairly automatic, layoff-related disputes were far less common than those involving demotion and discharge of public school teachers, which, as we discuss infra, were governed by multiple statutes, including the Teacher Tenure Act, MCL 38.71 *et seq*.

[5] Specifically, the Public Employee Relations Act ("PERA"), MCL 423.201 *et seq*.

Employment Relations Commission ("MERC"), adjudicated any legal challenge.[6] The Legislature did not grant any authority to any other administrative agency to deal with or review the subject of teacher layoffs. Seniority based layoffs, being solely a matter of collective-bargaining, made the answer to the question above—who gets to make and review decisions about teacher layoffs in the public schools—relatively simple and straightforward.

In 2011, this all changed when, for the first time in Michigan history, the Legislature exercised its constitutional role and decided that the Legislature and local school boards, not the unions or administrative agencies, would decide which teachers should be retained and which should be laid off in the event of a reduction in force. The key to this historic change was to remove the subject of teacher layoffs from the realm of collective bargaining. Doing so had the twofold effect of: (1) removing the unions as a decision maker on layoff-related issues; and (2) by definition, making it unnecessary for MERC to review layoff-related cases because they no longer implicated public-sector labor laws.

To implement this dramatic shift in the law of teacher layoffs, the Legislature also mandated that Michigan's several hundred school boards make layoff decisions based on merit, through the development of a mandated, comprehensive evaluation system for public school teachers. To make it perfectly clear that these decisions would be made by the local school boards, and not be sidetracked by administrative agencies, the Legislature took the additional and somewhat unusual precaution of explicitly saying how and by whom the layoff decisions could be reviewed.

As stated above, MERC obviously would no longer have reason to address this subject, and thus assert jurisdiction. And because the State Tenure Commission ("STC") had, prior to the 2011 Amendments, asserted jurisdiction over a few teacher-layoff suits—wrongfully, in our view, and based on a now non-binding 1975 decision of our Court—the Legislature again took the unusual, but prudent precaution of amending the Teacher Tenure Act ("TTA")[7] to remove the slim statutory basis which the STC claimed gave it jurisdiction over layoff-related actions. Finally, to make it absolutely clear that no administrative agency may review a school board's layoff decisions, the Legislature provided that a teacher's "sole and exclusive remedy" is to appeal the decision to the courts.

In sum, the 2011 Amendments affected a massive redistribution of power in the realm of teacher layoffs—from teacher unions to the local school districts as decision-makers, and from administrative agencies to the courts as the only recourse to review challenged layoff decisions.

### B. THE INSTANT CASE

---

[6] The union of a laid-off teacher could also claim a breach of the collective-bargaining agreement, which, as a violation of the labor agreement, would be heard by a private arbitrator, as the last step in the grievance-arbitration process under the terms of the collective-bargaining agreement.

[7] MCL 38.71 *et seq*.

In these appeals, petitioners essentially seek to unmake the 2011 Amendments through a seldom used and non-binding 1975 decision of our Court that, prior to the 2011 Amendments, gave the STC a minor and narrow role in reviewing teacher layoffs.

Under the TTA, the STC had no legal authority to adjudicate layoff-related disputes, because as an administrative agency, the STC's powers are limited to those expressly granted by the Legislature.[8] And, in the TTA, the Legislature granted the STC jurisdiction only over the discharge and demotion of teachers—not the layoff of teachers. Nonetheless, citing the aforementioned 1975 decision, the STC, in a few rare instances, improperly exercised jurisdiction over cases that involved the layoff of teachers by essentially characterizing a layoff as a discharge. As we said above, because the Legislature wished the 2011 Amendments to be implemented without this sort of administrative agency interference, it amended the TTA to underscore that the subject of layoffs is no longer within the STC's limited reach of jurisdiction.

The seasoned lawyers who act as administrative law judges ("ALJs") for the state Department of Education adjudicated these cases, correctly, by holding what is obvious: the STC no longer has any warrant to address layoff-related disputes. However, the political appointees who comprised the STC when it heard these appeals[9] could not bring themselves to comply with this clear legislative fact. Instead, the STC inexplicably ruled that it had jurisdiction over teacher layoffs, using the 1975 decision of our Court that the 2011 Amendments rendered null and void.

By the simple expedient of claiming jurisdiction to adjudicate hundreds of layoffs under a specious theory, the STC, surely, if upheld, would preclude any school district from making the merit-based layoffs required under the 2011 Amendments. By this "legal" sleight of hand, the STC also attempted to ensure that it, not the courts, would review layoff-related cases, in direct contravention of the legislative mandate to remove jurisdiction over these matters from administrative agencies, and give courts exclusive appellate jurisdiction. Indeed, to do this, the STC had to brazenly ignore the clear legislative mandate that a teacher's only appeal is to the judiciary.

We reject this unseemly power grab by the STC, and by doing so, reject its practical effect of overturning major, historic public-policy changes made by the people's representatives in the Legislature.

## II. FACTS AND PROCEDURAL HISTORY

Petitioners, who initially numbered in the hundreds, are teachers who were laid off by respondents, their public-school-district employers. Respondents faced budgetary restrictions

---

[8] "[T]he powers of administrative agencies . . . are limited to those expressly granted by the Legislature." *Herrick Dist Library v Library of Mich*, 293 Mich App 571, 574; 810 NW2d 110 (2011).

[9] The commissioners who wrote the deciding opinion were appointed by the prior gubernatorial administration, and are no longer members of the STC.

during 2011 and 2012, and accordingly reduced their staff sizes via the layoff methodology mandated by two sections of the School Code[10] enacted as part of the 2011 Amendments: MCL 380.1248 and MCL 380.1249. No longer having the protection of LIFO in labor agreements (and therefore losing MERC as an option to adjudicate their objections), petitioners' lawyers cited our Court's 1975 decision, and initiated these suits before the Michigan Department of Education in 2012. In each case, the ALJs—seasoned and experienced lawyers—rejected petitioners' claims and granted respondents summary judgment. Specifically, each ALJ correctly ruled that the 2011 Amendments to the TTA and School Code made very clear that the STC lacked jurisdiction, and that those claims could only be heard by the court system.

The petitioners in each case appealed the ALJs' decisions to the STC, and its political appointees (again, from a prior administration) rejected the ALJs' holdings in a series of orders entered in late 2012 and early 2013. The STC asserted that Michigan case law, which predated the 2011 Amendments, gave it jurisdiction over layoff claims that asserted "subterfuge," and that the 2011 Amendments did not revoke this jurisdiction. One commission member dissented, and agreed with the conclusion of the ALJs that the STC did not possess jurisdiction over layoff cases.[11] Each STC order is interlocutory—it remands the cases to the ALJs that first heard them.

Respondents appealed the STC orders to our Court in early 2013, and ask us to reverse them because the STC does not have jurisdiction over layoff-related cases. Petitioners assert that the STC has jurisdiction over layoff-related cases, and that our Court does not have jurisdiction to review these interlocutory orders of the STC. We consolidated petitioners' and respondents' appeals in April and May of 2013 for administrative reasons.[12]

These appeals therefore present two issues, both of which involve jurisdiction: (1) does our Court have jurisdiction to review interlocutory orders of the STC; and (2) did the STC wrongly assert that it has jurisdiction over layoff-related matters? The answer to both questions is clearly "yes."

## III. ANALYSIS

### A. JURISDICTION OVER INTERLOCUTORY STC ORDERS[13]

MCL 24.301, which, as part of the state Administrative Procedures Act, governs the judicial review of agency adjudications, states:

---

[10] MCL 380.1, *et seq*.

[11] Again, the other commissioners, who authored the majority's incorrect analysis, are no longer members of the STC.

[12] *Aubert v Reed City Area Pub Sch Bd of Ed,* unpublished order of the Court of Appeals, entered April 23, 2013 (Docket No. 314158); *Wright v Bd of Ed of Flint Community Sch*, unpublished order of the Court of Appeals, entered May 22, 2013 (Docket No. 314696).

[13] The question of whether a court has subject matter jurisdiction is reviewed de novo. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 278; 831 NW2d 204 (2013).

When a person has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, the decision or order is subject to direct review by the courts as provided by law. Exhaustion of administrative remedies does not require the filing of a motion or application for rehearing or reconsideration unless the agency rules require the filing before judicial review is sought. A preliminary, procedural or intermediate agency action or ruling is not immediately reviewable, except that the court may grant leave for review of such action if review of the agency's final decision or order would not provide an adequate remedy. [MCL 24.301.]

Accordingly, a Michigan court cannot review an interlocutory judgment of an administrative agency unless the agency's "final decision or order" will not "provide an adequate remedy." This exception to MCL 24.301's general prohibition on court review of interlocutory orders of administrative agencies is narrow.[14] But in rare circumstances, our Court has taken jurisdiction over appeals from interlocutory administrative orders if the appeal possesses the following two qualities.[15] First, a party's claim must rest entirely on jurisdictional grounds—i.e., it must challenge the right of the administrative agency to hear the case at all.[16] Second, our Court's review of the party's case must not undermine the policies behind the rule on exhaustion of administrative remedies.[17]

---

[14] For an example of the generally strict application of this general prohibition, see *Judges of 74th Judicial Dist v Bay Co*, 385 Mich 710, 727–728; 190 NW2d 219 (1971); and *Bennett v City of Royal Oak Sch Dist*, 10 Mich App 265, 268; 159 NW2d 245 (1968) ("[t]he fact that administrative action may be erroneous does not create any exception to the rule that the statutory administrative procedures must be exhausted before judicial relief is sought").

[15] See *Turner v Lansing Twp*, 108 Mich App 103, 109; 310 NW2d 287 (1981) (" 'exhaustion of administrative remedies is not an inflexible condition precedent to judicial consideration, however, and will not be required if review of the agency's final decision would not provide an adequate remedy' "), quoting *IBM Corp v Dep't of Treasury*, 75 Mich App 604, 610; 255 NW2d 702 (1977).

[16] See *IBM*, 75 Mich App at 610 ("[p]laintiff's suit seeks to avoid the expenses of litigation and disclosure which would be incurred by submitting to the agency's procedures for redetermination. The very harm that plaintiff seeks to avoid would inevitably occur if plaintiff were required to exhaust administrative remedies before access to judicial review"); and *Huggett v Dep't of Natural Resources*, 232 Mich App 188, 192; 590 NW2d 747 (1998) (reviewing an interlocutory order of an ongoing administrative proceeding where "[p]laintiffs' argument is that the Legislature exempted the proposed activity from defendant's regulation").

[17] See *IBM*, 75 Mich App at 610:

Exhaustion of administrative remedies serves several policies: (1) an untimely resort to the courts may result in delay and disruption of an otherwise cohesive administrative scheme; (2) judicial review is best made upon a full factual record

Because the STC[18] clearly has no jurisdiction over teacher layoffs, its orders are void. And, our exercise of jurisdiction over respondents' cases does not and will not undermine the policies behind the rule on exhaustion of administrative remedies. Hearing the cases now will make the administrative process more efficient by eliminating the need for further ALJ proceedings, and by expediting the appeal of the hypothetical ALJ holdings that would inevitably follow. No further administrative proceedings are necessary to develop the factual record on the sole issue in this case: the jurisdiction of the STC. This issue is a solely legal one—statutory interpretation—an area in which our Court has a certain expertise. And, from a judicial economy perspective, the number of appeals involved in these consolidated cases indicate that this issue will reappear in the administrative and judicial system until our Court has issued a binding opinion on the matter.

These appeals therefore present a textbook illustration of the rare circumstance when our Court may hear an interlocutory appeal from the judgment of an administrative agency. Petitioners' assertion that we lack jurisdiction over these cases is simply wrong—it is a practiced effort to subvert legislative amendments that remove (very questionable) jurisdiction from an agency they prefer (the STC) and transfer power to a system they find less amenable (the Michigan judiciary).

The Court of Appeals unquestionably has jurisdiction over these cases pursuant to MCL 24.301 because a "final decision or order" from the STC will not "provide [respondents with] an adequate remedy"—such an order is incapable of addressing the jurisdictional issue at the heart of these appeals.

## B. STC JURISDICTION

### 1. PRINCIPLES OF STATUTORY INTERPRETATION

Matters of statutory interpretation are reviewed de novo. *People v Lewis*, 302 Mich App 338, 341; 839 NW2d 37 (2013). When it interprets a statute, a reviewing court looks to ascertain and implement the intent of the Legislature. *Huron Mountain Club v Marquette Co Road Comm*, 303 Mich App 312, 323; 845 NW2d 523 (2013). The Legislature's intent is best expressed through the plain meaning of the statute's language. *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014). Although courts may look to legislative history to discern legislative intent, "not all legislative history is of equal value," and those types of legislative history that "do

---

developed before the agency; (3) resolution of the issues may require the accumulated technical competence of the agency or may have been entrusted by the Legislature to the agency's discretion; and (4) a successful agency settlement of the dispute may render a judicial resolution unnecessary.

See also *Huggett*, 188 Mich App at 192; and *Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 52–53; 620 NW2d 546 (2000).

[18] The STC is an administrative body within MCL 24.301. See *Beebee v Haslett Pub Sch*, 40 Mich App 296, 298–299; 198 NW2d 860 (1972).

not necessarily reflect the intent of the Legislature as a body," are "significantly less useful" than those that do. *People v Gardner*, 482 Mich 41, 57–58; 753 NW2d 78 (2008).

Though an administrative agency's interpretation of a statute is entitled to "respectful consideration," and, if persuasive, "should not be overruled without cogent reasons," the agency's interpretation is not binding and "cannot conflict with the plain meaning of the statute." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 108; 754 NW2d 259 (2008). Importantly, in the specific context of the TTA, the Michigan Supreme Court has "indicated its belief that the coverage of the tenure act was not determined by the administrative or judicial perception of the spirit of the act but by the language of the act itself." *LeGalley v Bronson Community Sch*, 127 Mich App 482, 486; 339 NW2d 223 (1983), citing *Street v Ferndale Bd of Ed*, 361 Mich 82, 87; 104 NW2d 748 (1960).

"Statutes that address the same subject or share a common purpose are *in pari materia* and must be read together as a whole." *People v Harper*, 479 Mich 599, 621; 739 NW2d 523 (2007) (emphasis in original). Statutes enacted by the Legislature on a later date take precedent over those enacted on an earlier date. *Parise v Detroit Entertainment, LLC*, 295 Mich App 25, 28; 811 NW2d 98 (2011). "When two statutes are *in pari materia* but conflict with one another on a particular issue, the more specific statute must control over the more general statute." *Id*. at 27–28.

## 2. STC HAS JURISDICTION OVER DISCHARGES, NOT LAYOFFS

The STC's "jurisdiction and administrative expertise is limited to questions traditionally arising under the [TTA]," and it does not possess jurisdiction over disputes that arise under and are governed by separate legislative acts. *Ranta v Eaton Rapids Pub Sch Bd of Ed*, 271 Mich App 261, 273; 721 NW2d 806 (2006).[19]

Though the TTA mentions "discharge" and "demotion"[20] specifically as matters that fall within the remit of the STC, it says nothing about "layoffs"—nor does it provide the STC with

---

[19] See also *Rockwell v Bd of Ed of Sch Dist of Crestwood*, 393 Mich 616, 630; 227 NW2d 736 (1975) ("[The STC's] jurisdiction and administrative expertise is limited to questions traditionally arising under the [TTA]").

[20] MCL 38.121 authorizes tenured teachers to "appeal to the [STC] any decision of a controlling board under this act, other than a decision governed by article IV on discharge or demotion of a teacher." "Article IV" is MCL 38.101 *et seq*., which is another section of the TTA that outlines specific rules and procedures for the "discharge" and "demotion" of tenured teachers. MCL 38.104(5)(j) provides the STC with jurisdiction over cases that involve discharge and demotion of tenured teachers, under the rules specified in MCL 38.101, *et seq*. As explained in n 21, the terms "discharge" and "demotion" do not and have never encompassed "layoffs," the employment action complained of in this case.

jurisdiction over these matters.[21]  Moreover, as noted, layoffs—and the methodology for how layoffs were conducted—were exclusively the subject of collective-bargaining agreements.[22]  As such, challenges to layoff decisions were regarded as unfair labor practices, which would be a violation of PERA adjudicated by MERC.

Nonetheless—in violation of this statutory distinction between "layoffs" and "discharges" and "demotions"—one appellate decision, *Freiberg v Bd of Ed of Big Bay De Noc Sch Dist*,[23] asserted that the STC had jurisdiction over a small number of layoff-related claims.  It did so under the judicially created "subterfuge" doctrine, which allowed the STC to hear claims that asserted the stated reason for layoff—for instance, economic hardship—was a mere pretext to terminate the teacher in bad faith.  *Freiberg*, 61 Mich App at 413–414.[24]  Yet, dispositively,

---

[21] The only phrase in the TTA that could conceivably have anything to do with "layoffs" was a "necessary reduction in personnel," mentioned in MCL 38.105:

> For a period of 3 years after the effective date of the termination of the teacher's services, a teacher on continuing tenure whose services are terminated because of a necessary reduction in personnel shall be appointed to the first vacancy in the school district for which the teacher is certified and qualified.

For all intents and purposes, it appears that the "necessary reduction in personnel" mentioned in MCL 38.105 meant "layoff."  See *Tomiak v Hamtramck Sch Dist*, 426 Mich 678, 688; 397 NW2d 770 (1986) (holding that a "necessary reduction in personnel" per MCL 38.105 is not a "discharge" or "demotion," and explicitly using the term "layoff" as a placeholder for "necessary reduction in personnel").  But, again, this provision did not give the STC jurisdiction to adjudicate layoff-related disputes.  And, in any event, MCL 38.105 was repealed by 2011 PA 101, so it is of no relevance to these appeals.

[22] As noted in n 4, see House Legislative Analysis, HB 4625, 4626, 4627, 4628, June 15, 2011 (describing how collectively bargained work rules removed control over layoff decisions from local school boards, because many collective bargaining agreements followed the "so-called LIFO rule: Last In, First Out.  That is, in the event of downsizing, the most recently hired teachers are the first to be dismissed (regardless of their effectiveness), while the most veteran teachers are retained (also regardless of their effectiveness)").

[23] 61 Mich App 404; 232 NW2d 718 (1975).  *Freiberg* involved a single teacher—not, as here, a large group of teachers—who alleged that his layoff was in effect a termination.  *Id*. at 406–407.

[24] By its own admission, the *Freiberg* Court could point to no specific statutory language in the TTA that justified its holding.  Instead, the Court asserted that it found reasons to grant the STC jurisdiction over layoff-related cases in: "the general purpose of the tenure act, the statutory provision giving teachers the right to appeal any adverse decision by the local board of education," and supposedly "analogous" Michigan Supreme Court decisions that expressed "a willingness to look behind an employer's statement of economic need to be sure that the layoff was not a subterfuge."  *Id*. at 412–413.  *Freiberg* also mentioned MCL 38.105, and suggested that it too gave the STC jurisdiction over "subterfuge" claims.  *Id*. at 412.

*Freiberg* is no longer binding and has been rendered null and void by the 2011 Amendments in issue.[25]

In sum, the STC's jurisdiction is limited to issues that arise under the TTA. *Ranta*, 271 Mich App at 273. It does not possess jurisdiction over issues that do not arise under the TTA. *Id*. As of 2011, the STC's dubious and rarely exercised jurisdiction over layoff-related claims was based on a single appellate case—which is now non-binding, and null and void under the 2011 Amendments—not any plain statutory language contained in the TTA.

## 3. THE 2011 AMENDMENTS

During the economic crisis that befell Michigan in the last decade, Michigan schools had new, significant budgetary constraints and faced declining enrollments, and were accordingly forced to lay off teachers. In 2011, the Michigan Legislature enacted a package of tie-barred amendments to the TTA, School Code, and PERA that clearly outlined a teacher's rights and a school district's responsibilities in the event that a layoff became necessary. 2011 PAs 100, 101, 102, and 103 work in tandem to: (1) bar teacher layoffs from being a subject of collective-bargaining agreements, thus preventing teachers from challenging layoff decisions before MERC as an unfair labor practice under PERA; (2) require that layoff decisions be based on teacher effectiveness, not seniority[26]; and (3) make clear that only the courts—not any administrative agency, including the STC—have jurisdiction over layoff-related claims. We address each in turn.

## 3A. PERA AND COLLECTIVE BARGAINING: PA 103

Among other things, 2011 PA 103 amended part of PERA to read:

(3) Collective bargaining between a public school employer and a bargaining representative of its employees shall not include any of the following subjects:

* * *

(k) Decisions about the development, content, standards, procedures, adoption, and implementation of the public school employer's policies regarding personnel decisions when conducting a staffing or program reduction or any other personnel determination resulting in the elimination of a position, when conducting a recall from a staffing or program reduction or any other personnel determination

---

[25] MCR 7.215(J)(1) states that: "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule." Our Court issued *Freiberg* in 1975, and it is thus no longer binding on our panel.

[26] Under 2011 PA 102, seniority is relevant, but only in a "tiebreaker" context, which we discuss in detail later in the opinion.

resulting in the elimination of a position, or in hiring after a staffing or program reduction or any other personnel determination resulting in the elimination of a position, *as provided under section 1248 of the revised school code, 1976 PA 451, MCL 380.1248, any decision made by the public school employer pursuant to those policies, or the impact of those decisions on an individual employee or the bargaining unit.* [MCL 423.215 (emphasis added).]

As a result, any layoff decision made under MCL 380.1248 and MCL 380.1249 cannot be the subject of a collective-bargaining agreement. 2011 PA 103's removal of layoffs from the collective-bargaining process thus also bars MERC from adjudicating layoff disputes as an unfair labor practice under PERA. 2011 PA 103 clearly closes these adjudicative paths by removing layoff-related matters from the collective-bargaining process, and emphasizing that the School Code—not the PERA or the TTA—governs teacher layoffs.

Instead, an aggrieved teacher laid off pursuant to MCL 380.1248 and MCL 380.1249 must look to those specific sections of the School Code for the proper forum in which to bring a claim. In addition to specifying that the Michigan judiciary is the only forum in which a laid off teacher may seek redress, MCL 380.1248 and MCL 380.1249 also detail a specific methodology by which local school districts must select teachers to be laid off.

3B. MERIT, NOT TENURE: 2011 PA 102 AND MCL 380.1248 AND 380.1249[27]

2011 PA 102 amends the School Code, which is a separate and distinct body of law from the TTA. Among other things, it governs "the regulation of school teachers and certain other school employees,"[28] and emphasizes that *local authorities—not state officials*—are primarily responsible for the governance of school districts.[29] As noted, and in keeping with this spirit of local control, the STC has no jurisdiction over matters that arise under the School Code.

2011 PA 102 is part of this broader legal framework, and enacted a comprehensive revision of the School Code's treatment of teacher layoffs through the addition of two new sections, MCL 380.1248 and MCL 380.1249. Section 1249 requires all Michigan "school district[s], intermediate school district[s], and board[s] of directors of a public school academy"

---

[27] For further discussion of MCL 380.1248 and 380.1249, see *Garden City Ed Ass'n v Sch Dist of Garden City*, 975 F Supp 2d 780, 781–784 (ED Mich, 2013). *Garden City* involved a group of teachers who claimed that MCL 380.1248 and MCL 380.1249 violated their right to due process, as their tenured positions supposedly were property rights worthy of protection. The court rejected their federal constitutional claim. It also held that the teacher plaintiffs failed to state a claim under § 1248, as the "sole and exclusive remedy" in the statute was reinstatement, and that "economic damages . . . are expressly precluded" by the statute. *Id.* at 788.

[28] MCL 380.1.

[29] See MCL 380.11a(3) (stating that "[a] general powers school district" is permitted, except as provided by law, to "exercise a power implied or incidental or appropriate to the performance of a function related to the operation of [a] school district. . .").

to adopt a "performance evaluation system" that assesses teacher effectiveness and performance, and provides a detailed set of factors that any school district's "performance evaluation system" must include. Specifically, § 1249 requires that any performance evaluation system must rate its teachers in four classes, on the basis of their performance as a teacher: (1) "highly effective"; (2) "effective"; (3) "minimally effective"; and (4) "ineffective." MCL 380.1249(1)(c).

Section 1248 then mandates that all "policies regarding personnel decisions when conducting a *staffing or program reduction*"—i.e., *layoffs*—must be conducted on: (1) the basis of the "performance evaluation system" the school district developed in compliance with § 1249; and (2) other specific factors listed in § 1248. See MCL 380.1248(1)(b)(*i*)–(*iii*) (emphasis added). Length of service or "tenure status" cannot be a factor in making layoff decisions except in a "tiebreaker" context—i.e., when "all other factors distinguishing [two] employees from each other are equal, then length of service or tenure status may be considered as a 'tiebreaker.' " MCL 380.1248(1)(c).

In other words, if layoffs become necessary, § 1248 requires school districts to base their decision of which teachers to lay off on the effectiveness of each teacher. So, after conducting a performance evaluation using the criteria outlined in § 1249, a school district must list its teachers in rank order, based on their success (or lack thereof) in the performance evaluation. The teachers that received the lowest performance rankings ("ineffective") will be laid off before those that received higher performance rankings. The statutory mandate anticipates that talented and more effective teachers will be retained, while mediocre and ineffective teachers will be laid off.

If a teacher challenges his employer's decision to lay him off, § 1248 provides him with a "sole and exclusive" remedy:

> If a teacher brings an action against a school district or intermediate school district based on this section, the teacher's *sole and exclusive remedy shall be* an order of reinstatement commencing 30 days after a *decision by a court of competent jurisdiction.* The remedy in an action brought by a teacher based on this section shall not include lost wages, lost benefits, or any other economic damages. [MCL 380.1248(3) (emphasis added).]

The use of the terms "sole and exclusive remedy" and "court" makes it clear beyond peradventure that administrative agencies, be it MERC or the STC, no longer have any role in reviewing layoff decisions made by school boards.

3C. THE STC DOES NOT HAVE JURISDICTION OVER LAYOFFS: 2011 PA 100 AND 101

As noted, the STC only possesses jurisdiction over matters that arise under the TTA. *Ranta*, 271 Mich App at 273. It does not have jurisdiction over matters that arise under any other statute. *Id.* Accordingly, if a subject matter is not present in the TTA, the STC does not have jurisdiction over that subject matter. Recall that even before the 2011 Amendments, the STC rarely exercised jurisdiction over cases involving layoffs, and had little statutory basis to do so. Whatever jurisdictional authority it had to address layoff-related claims came from the

"subterfuge" doctrine, mentioned nowhere in the TTA, and advanced by a single appellate decision.

2011 PA 100 made it clear that if the STC ever had jurisdiction over layoffs, it no longer has jurisdiction over layoff-related claims. It is not possible to equate the "discharge" action mentioned in MCL 38.101 with a "layoff," as the two terms are separate and distinct. See *Tomiak*, 426 Mich at 688. And to remove any lingering doubt that the word "demote" could include "layoffs," 2011 PA 100 revised the TTA's definition of "demote" to read as follows:

> The word "demote" means to suspend without pay for 15 or more consecutive days or reduce compensation for a particular school year by more than an amount equivalent to 30 days' compensation or to transfer to a position carrying a lower salary. However, demote does not include discontinuance of salary pursuant to section 3 of article IV [MCL 38.103], the discontinuance or reduction of performance-based compensation pursuant to section 1250 of the revised school code [MCL 380.1250] . . . *or a reduction in personnel, including, but not limited to, a reduction in workweeks or workdays*. [MCL 38.74 (emphasis added).]

Thus, by definition, a school that lays off a teacher does not "demote" that teacher in the context of the TTA. The STC is therefore barred from using MCL 38.74 as a jurisdictional hook to hear layoff-related cases. With MCL 38.74 accordingly modified, 2011 PA 101 repealed MCL 38.105, which governed "reductions in personnel"—the last remaining statutory section of the TTA that could conceivably (but wrongly) be seen as having anything to do with teacher layoffs. The TTA—which, again, never contained the word "layoff"—is now devoid of any reference to "reductions in personnel," meaning that it is beyond doubt that the STC lacks jurisdiction over cases that involve such issues.

The 2011 Amendments also revoked any jurisdictional basis that *Freiberg* provided to the STC in so-called "subterfuge" cases. As noted, *Freiberg* based its dubious grant of jurisdiction to the STC on the following: (1) "the general purpose of the tenure act"; (2) MCL 38.121; (3) supposedly "analogous" decisions of the Michigan Supreme Court in cases involving layoffs of private-sector employees; and (4) MCL 38.105. See *Freiberg*, 61 Mich App at 412–414.

Collectively, the 2011 Amendments invalidate each of these alleged bases for STC jurisdiction over layoff-related cases that involve "subterfuge." The "general purpose of the tenure act" no longer includes teacher layoffs, which are now governed by the School Code.[30] MCL 38.121 is thus irrelevant to these cases, as it only allows tenured teachers to seek redress on issues governed by the TTA. The TTA does not govern the layoff of teachers, nor, with the repeal of MCL 38.105, does it even mention any employment status that could conceivably be interpreted as having anything to do with layoffs. And Michigan case law that interprets other,

---

[30] See MCL 380.1248 and 380.1249. See also *LeGalley*, 127 Mich App at 486 ("the coverage of the tenure act was not determined by the administrative or judicial perception of the spirit of the act but by the language of the act itself").

unrelated statutes is not binding or apposite on these cases, because teacher layoffs are regulated by their own statutory scheme.[31]

Accordingly, the statutory framework that *Freiberg* purported to interpret has been significantly modified, rendering that decision moot, and null and void. See *Detroit Trust Co v Allinger*, 271 Mich 600, 610; 261 NW 90 (1935) ("repeal of a statute divests all inchoate rights which have arisen under the statute which it destroys").[32]  If a teacher plaintiff claims that a school-district defendant violated §§ 1248 and 1249, he must bring suit in a "court of competent jurisdiction," i.e., a court in the Michigan judiciary, not the STC, and seek the "sole and exclusive remedy" under § 1248: reinstatement.  MCL 380.1248(3).

The effect of 2011 PA 100 and 101, then, is to make clear that the STC does not have jurisdiction over layoff-related claims, including those alleged to be a "subterfuge," because layoffs of teachers are explicitly governed by §§ 1248 and 1249 of the School Code—not the TTA.  Accordingly, a laid-off teacher must seek redress for §§ 1248 and 1249 violations with the judiciary, not administrative agencies.

### 4.  APPLICATION

Here, petitioners argue that the STC has jurisdiction over layoff-related claims.  Their reasoning is as follows: the STC has exercised jurisdiction over a small number of layoff cases under the "subterfuge" doctrine created by *Freiberg*.  Thus, whenever a teacher alleges that his layoff was a bad faith attempt to terminate him without an administrative hearing, the STC can claim jurisdiction over the suit.  The statutory basis for the STC's jurisdiction over these sorts of actions, as explained by *Freiberg*, is MCL 38.121, which permits teachers to "appeal to the [STC] any decision of a controlling board under this act, other than a decision governed by article IV on the discharge or demotion of a teacher."  The 2011 Amendments did not repeal MCL 38.121, so the STC thus has jurisdiction over any layoff-related claim that asserts "subterfuge."

---

[31] See MCL 380.1248 and 380.1249.

[32] It is important to note that legislative modification of an existing statute does not always give our Court a free hand to disregard older cases that interpreted the older version of the statute. For instance, if the Legislature amended a statute that the Michigan Supreme Court had previously interpreted, vertical stare decisis would require our Court to follow the Michigan Supreme Court's precedent—even if the statutory amendments had rendered that precedent irrelevant.  See *People v Mitchell*, 428 Mich 364, 369; 428 NW2d 798 (1987); and *In re Nestorovski Estate*, 283 Mich App 177, 206–207; 769 NW2d 720 (SAAD, J., dissenting).

Here, however, the Michigan precedent interpreting the old version of the statute at issue (*Freiberg*) was issued by our Court—not the Michigan Supreme Court.  Vertical stare decisis is thus not implicated.  Accordingly, we may disregard *Freiberg*'s holding because: (1) the statutory framework which it purported to interpret has been completely altered; and (2) it is no longer binding on our panel.

This argument is without merit because it fails to read MCL 38.121 in its post-2011 context. Again, MCL 38.121 states that tenured teachers may "appeal to the [STC] any decision of a controlling board *under this act . . .*" (emphasis added). As noted, layoffs are not (and never were) "under" the TTA—the 2011 Amendments systematically purged the Act of reference to any terms that could conceivably have anything to do with layoffs, and created two new sections of the School Code (a wholly separate statute from the TTA) to govern layoff decisions. See MCL 380.1248 and 380.1249. MCL 380.1248 explicitly specifies a *single remedy* for laid-off teachers that contest their layoff:

> If a teacher brings an action against a school district or intermediate school district based on this section, *the teacher's sole and exclusive remedy* shall be an order of reinstatement commencing 30 days after a decision *by a court of competent jurisdiction*. The remedy in an action brought by a teacher based on this section shall not include lost wages, lost benefits, or any other economic damages. [MCL 380.1248(3) (emphasis added).]

The STC cannot be such a "court of competent jurisdiction" because it only possesses jurisdiction over matters that arise under the TTA, which does not govern teacher layoffs—and, more importantly, most assuredly is not a court. *Ranta*, 271 Mich App at 273. Thus, the continued existence of MCL 38.121 does nothing to advance petitioners' argument. It states a truism—the STC has jurisdiction over decisions made by a "controlling board" on subjects that are governed by the TTA—that is inconsequential to this case.

As we pointed out earlier, petitioners' invocation of *Freiberg* is equally irrelevant, because *Freiberg*'s interpretation of the TTA rested on statutory provisions that have since been repealed or modified. As noted, the 2011 Amendments repealed MCL 38.105, the slim statutory authority on which *Freiberg* based its holding. The "general purpose of the tenure act" has been radically altered, because that Act now makes clear that it does not govern teacher layoffs. MCL 38.121 is of no relevance to our case, as explained above, and *Freiberg*'s reference to supposedly "analogous" Michigan Supreme Court cases are of equal irrelevance, because teacher layoffs are now governed by their own statutory framework, not unrelated Michigan statutes or common law.

In sum, the 2011 Amendments have rendered *Freiberg*'s holding null and void. There is no better illustration of the Michigan Supreme Court's holding in *Detroit Trust Co*, 271 Mich at 610: "repeal of a statute divests all inchoate rights which have arisen under the statute which it destroys."[33]

The STC thus improperly exercised jurisdiction over petitioners' suits. In so doing, it blatantly ignored the 2011 Amendments and contravened the will of the Legislature. The STC is

---

[33] Despite petitioners' claims to the contrary, the Legislature's removal of STC jurisdiction over layoff-related cases will have little effect on the substantive rights of tenured teachers. For example, if a school district uses MCL 380.1248 to terminate a teacher on the basis of his race, ethnicity, or sex, he may seek redress in state court for violation of state civil-rights laws.

not above the law and may not change "the laws enacted by the Legislature"[34] to suit its policy preferences.  Its orders, based on an illegitimate assumption of jurisdictional authority, cannot stand.

## IV.  CONCLUSION

For the first time in Michigan's history, the Legislature decided to exercise its constitutional authority[35] in the field of teacher layoffs.  The Legislature made merit, not seniority, the controlling factor in layoff decision making, to retain the best teachers in the classroom.  It did so by removing teacher layoffs as a subject of collective bargaining and this in turn removed unions and administrative agencies from the dispute-resolution process in this specific realm of public-sector labor law.  To underscore that school boards, and not unions or administrative agencies, would make these decisions, the Legislature gave school boards the power to make layoff decisions, and gave the courts the sole and exclusive power to review the school boards' decisions.

Accordingly, we reject the STC's attempt to undo this landmark legislation, and hold that: (1) our Court has jurisdiction over respondents' appeals of the STC's interlocutory orders; and (2) the STC does not have jurisdiction over claims related to the layoff of tenured teachers. We therefore reverse the orders of the STC and dismiss petitioners' suits.


/s/ Henry William Saad
/s/ Pat M. Donofrio
/s/ Patrick M. Meter

---

[34] *In re Complaint of Rovas*, 482 Mich at 98.

[35] Again, see Const 1963, Art 8 § 2 ("The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law").